UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

WASHINGTON REGIONAL MEDICAL CENTER                                    PLAINTIFF

v.                              No. 5:17-CV-05245

MICHAEL R. RABER, M.D.                                                DEFENDANT

## OPINION AND ORDER

This matter came before the Court on October 9, 2018 for a bench trial on Washington Regional Medical Center's ("WRMC") Complaint (Doc.1) against Michael R. Raber, M.D. ("Raber") for breach of contract (Count 1) and unjust enrichment (Count 2). Before trial, the Court granted WRMC's motion for partial summary judgment (Doc. 14) for breach of contract for a sign-on bonus of $48,000 and stated it would enter judgment on the $48,000 following final resolution of all issues. (Doc. 21). Before trial, the Court granted in part and denied in part Raber's motion for partial summary judgment (Doc. 22) and dismissed the claim for unjust enrichment. (Doc. 31). The parties stipulated before trial that Raber breached his employment contract with WRMC (Docs. 29 & 30), and that the remaining issue for trial was the amount of damages. The parties stipulated to some exhibits received into evidence, and the Court overruled Raber's objection to certain exhibits that were also received into evidence. The Court heard the testimony of two witnesses and then took the case under submission. Having considered the testimony of the witnesses and the exhibits received into evidence, and made credibility determinations on the evidence, the Court makes the following findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

**I. Findings of Fact**

WRMC is a nonprofit corporation organized under the laws of the State of Arkansas with its principal place of business in Fayetteville, Arkansas. Raber is a medical doctor who is a citizen and resident of the State of Texas.

Raber is a board-eligible neurosurgeon, having graduated from medical school at Wake Forest University. Following his graduation from medical school, Raber did residency training at the University of Arkansas for Medical Sciences ("UAMS") and Harvard Medical School, and did fellowship training at Johns Hopkins Medical School. After nine years of residency and fellowship training, Raber sought employment with several hospitals as a general neurosurgeon.

Raber was referred to WRMC by Dr. John Barr ("Barr"), who was a general neurosurgeon at WRMC. Raber and Barr worked together for three years in the residency program at UAMS. Beginning in early 2016, Raber made three visits to WRMC before signing an employment contract with WRMC on December 16, 2016. During the three visits, Raber met with WRMC's management and neurosurgical staff, including Dr. David Ratcliff, director of WRMC's trauma center. He also met with neurosurgeons Barr, Dr. Brandon Evans, and Dr. Larry Armstrong.

WRMC is a community hospital serving 25 counties in Northwest Arkansas, Southwest Missouri, and Eastern Oklahoma. WRMC is classified by the State of Arkansas as a Trauma II medical center. A Trauma II designation requires the medical center to have 95% on-call neurosurgery coverage in the emergency department. At the time Raber interviewed with WRMC, Drs. Barr, Evans, and Armstrong were providing on-call neurosurgery coverage for WRMC. Two other neurosurgeons provided endovascular coverage, but not general on-call neurosurgical coverage.

Raber executed an employment contract with WRMC on December 16, 2016. The term of

employment was for three years, beginning on July 1, 2017. Raber was to provide general neurosurgical services for WRMC and clinical services at the Northwest Arkansas Neurosciences Institute, a neurological department of WRMC. The contract specifically provided that Raber would provide a minimum of 90 days of annual neurosurgical on-call coverage in the emergency department. Raber would conduct his clinical practice in the separate offices at the Northwest Arkansas Neurosciences Institute.

Under the employment contract, WRMC would pay Raber a sign-on bonus of $48,000, which was subject to federal and state taxes. Raber was to receive a base salary of $716,000, with a quality compensation bonus and additional compensation for any emergency call in excess of the 90 days of on-call coverage in the contract. Total compensation was not to exceed $1,474,000. Upon execution of the contract, WRMC paid Raber the $48,000 sign-on bonus and paid federal payroll taxes in the amount of $3,672.

On March 7, 2017, Raber called Larry Shackelford, the chief executive officer of WRMC, and told him that for personal reasons he would not be coming to WRMC. Shackelford told Raber that patient care at WRMC was going to be adversely impacted if he did not honor his commitment because it would create a problem in emergency care coverage. Shackelford followed up with a letter to Raber on March 10, 2017 explaining that his failure to honor his commitment would result in 1/3 of the days in the emergency department without neurosurgical coverage, and that WRMC would have to secure *locum tenens* neurosurgical coverage at significant cost. Raber did not claim the certified letter which required a return receipt.

On March 15, 2017, Raber sent a letter to Shackelford confirming his telephone call that he was withdrawing his commitment as a neurosurgeon on July 1, 2017, and that he would make efforts to repay the $48,000 sign-on bonus. Raber did not take the opportunity to cure his default

3

although WRMC's counsel sent a letter to Raber giving him the opportunity to do so. In a telephone call with Cindy Tabor, nursing director for neurosciences at WRMC, Raber also declined WRMC's offer to work for only one year and then be released from the contract. Shackelford made the same offer to Raber which would give WRMC time to recruit a replacement for Raber. Raber began employment with the Baylor College of Medicine in Houston, Texas on September 5, 2017 as a faculty member with clinic duties.

The Trauma II facility designation is critical to the mission of WRMC, which is the only medical center in the region providing full time neurosurgery coverage. If WRMC did not provide the Trauma II coverage, patients from the region would have to be transported to Springfield, Missouri or Tulsa, Oklahoma for emergency neurosurgical services. Before execution of the contract, Shackelford explained to Raber the significance of the Trauma II designation and the need to provide emergency neurosurgical coverage.

Raber would have been the fourth neurosurgeon employed by WRMC which would have given WRMC one in four coverage for emergency coverage. Before Raber's commitment, three neurosurgeons handled the on-call coverage. In January 2017, Dr. John Barr notified WRMC that he would not renew his annual contract when it expired in July 2017. Raber, a friend and resident colleague of Barr, said he did not learn of Barr's decision to leave WRMC until February 2017 when Barr told him of his decision to leave and return to academia at Duke University Medical School. In an email to WRMC staff in January 2017, Shackelford said that Barr's decision to leave WRMC would not impact patient care since Raber's arrival would coincide with Barr's departure.

During his testimony, Raber downplayed having knowledge and understanding of the critical importance of on-call coverage at WRMC, other than to say he knew it was a "necessary evil." Raber denied being told by Shackelford that the Trauma II designation required 95%

4

neurosurgery coverage and the significance of the designation for WRMC. Raber testified no one ever talked to him about what on-call coverage would mean in his practice although he met with Dr. Ratcliff, the director of the trauma center and the three neurosurgeons who were handling the on-call coverage. Raber testified that his primary responsibility was to build an elective spine practice with Drs. Barr, Evans, and Armstrong. Raber's testimony that he did not comprehend the significance of his contractual obligation to provide 90 days of on-call neurosurgical services is simply not credible. Raber spent nine years training at top rate medical centers that provided on-call neurosurgical care, and Raber no doubt understood the significance of his contractual obligation of on-call coverage. It was specifically expressed in the contract, reiterated by Shackelford before Raber signed the contract, and likely explained to him by the director of the trauma center and the three neurosurgeons.

Upon Raber's failure to cure his breach of contract, WRMC commenced recruitment of a replacement neurosurgeon. WRMC had already obtained a commitment from a neurosurgeon to begin in July of 2018, but did not have sufficient neurosurgical coverage in the interim. Dr. Evans and Dr. Armstrong worked with Shackelford to provide as much coverage as they could. WRMC had to secure *locum tenens* neurosurgical coverage since it only had two neurosurgeons on staff. WRMC contracted with Hayes Locums, LLC to provide neurosurgical care for two to three weekends a month from July 1, 2017 to August 1, 2018. During this period, WRMC paid Hayes Locums, LLC $305,911.74 for neurosurgery coverage. Shackelford, who secured the Hayes Locums, LLC, testified that the concept of *locum tenens* is a widely known and an accepted practice in extreme circumstances. WRMC also incurred recruitment expenses to find another neurosurgeon and eventually found a neurosurgeon to begin in 2019. WRMC incurred $9,177.02 in recruitment expenses during its recruitment of Raber to WRMC.

When Shackelford and WRMC negotiated the employment contract with Raber, neither Shackelford nor any other WRMC representative told Raber that he would be responsible for the costs of *locum tenens* neurosurgical coverage if he breached his employment contract. Although Raber was fully aware of WRMC's need for 95% on-call coverage, he was not informed by anyone at WRMC that it would expect him to pay for the on-call coverage if he breached his contract.

## II. Conclusion of Law

Because there is complete diversity of citizenship and the amount in controversy exceeds $75,000, the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332. Because this is a diversity case, the Court applies Arkansas substantive law. *Murray v. Greenwich Ins. Co.*, 533 F.3d 644, 648 (8th Cir. 2008) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938)).

The parties have stipulated that Raber breached his employment contract with WRMC when he notified WRMC that he would not begin his employment on July 1, 2017, and that he had no intention to perform his contractual obligations other than to repay the $48,000 sign-on bonus he received upon execution of the contract in December 2016. WRMC is entitled to damages for the breach of contract under Arkansas law.

When a contract has been breached, the wronged party is entitled to those damages that may fairly and reasonably be considered as arising naturally, or according to the usual course of things, from the breach of the contract itself. *Caldwell v. Guardian Tr. Co.*, 26 F.2d 218, 223 (8th Cir. 1928). The wronged party may recover such special damages "as may reasonably be supposed to have been in contemplation of both parties at the time they made the contract, as the probable result of a breach of it." *Miles v. American Ry. Express Co.*, 233 S.W. 930, 931 (Ark. 1921); *see* Howard W. Brill & Christian H. Brill, *Law of Damages* § 4.4 (6th ed. 2014).

Contract damages can be general or consequential. "General damages are those that

6

necessarily flow from the breach. Consequential damages refer to damages that are only indirectly caused by the breach—instead of flowing directly from the breach, they result from some of the consequences of the breach." *Hobson v. Entergy Arkansas, Inc.*, 432 S.W.3d 117, 126 (Ark. App. 2014) (citations omitted). On a claim for consequential damages, Arkansas law follows a minority rule known as the "tacit agreement" rule. *Fed. Deposit Ins. Corp. as Receiver for First S. Bank v. BKD, LLP*, No. 4:13cv720JM, 2014 WL 12769667, at * 3 (E.D. Ark. 2014).

To recover consequential damages on a contract, the plaintiff must prove the defendant knew at the time he entered the contract that his breach would cause the plaintiff to suffer special damages, and that the defendant "tacitly agreed" to assume responsibility for those damages. *Reynolds Health Care Svcs., Inc. v. HMNH, Inc.*, 217 S.W.3d 797, 803-04 (Ark. 2005). In the absence of an express contract to pay special damages, "the facts and circumstances in proof must be such as to make it reasonable for the judge or jury trying the case to believe that the party at the time of the contract tacitly consented to be bound to more than ordinary damages in case of default on his part." *Id.* at 804. Whether notice of any such special circumstances was given to the breaching party is a question of fact. *Id.* at 805.

The elements of general damages sought by WRMC are the $48,000 sign-on bonus, on which the Court has already entered partial summary judgment, the payroll taxes paid by WRMC on the sign-on bonus, and the recruiting expenses incurred by WRMC for having to recruit a replacement for Raber. The payroll taxes and recruitment expenses are damages arising naturally from the breach of contract. The Court concludes that WRMC is entitled to recover as general damages the payroll taxes paid by WRMC, and a reasonable amount of recruiting expenses to find a replacement neurosurgeon.

The element of special damages sought by WRMC is the expense of *locum tenens*

7

neurosurgeon on-call coverage from July 1, 2017 to August 1, 2018. Under the tacit agreement rule, a wronged party must not only prove that the other party knew the breach would cause the wronged party to suffer special damages, but that the other party agreed to assume responsibility for the special damages. *Reynolds Health Care Svcs., Inc.,* 217 S.W.3d at 803-04. The tacit agreement need not be written or express. When not written into the contract, "the facts and circumstances in proof must be such to make it reasonable for the judge or jury trying the case to believe that the party at the time of the contract tacitly consented to be bound to more than ordinary damages in case of default on his part." *Bank of America, N.A. v. C.D. Smith Motor Co. Inc.*, 106 S.W.3d 425, 431 (Ark. 2003) (citing *Hooks Smelting Co. v. Planters' Compress Co.*, 79 S.W. 1052, 1056 (Ark. 1904)).

Raber's knowledge of his contractual obligation to provide 90 days of on-call neurosurgical coverage, based on his nine years of experience as a neurosurgeon and based on being told of WRMC expectations under the contract, meets the first prong of the test in that he knew his breach of the contract would cause WRMC to incur special damages. Raber was fully aware when he executed the employment contract that WRMC was required to have 95% on-call neurosurgical coverage in its emergency room. Therefore, Raber knew that WRMC would incur expenses associated with providing alternative on-call neurosurgical coverage if he breached his contract.

However, the facts and circumstances surrounding the negotiation and execution of the contract do not rise to a level to meet the second prong of the test. There is insufficient evidence to show that Raber agreed to be responsible for *locum tenens* on-call neurosurgical expenses if he breached the contract. Neither Shackelford nor any other WRMC representative told Raber that he would be responsible for the expense to cover his 90 days of on-call neurosurgical coverage if he did not perform his duties under the contract. Even though the concept of *locum tenens* services

in extreme circumstances is generally known and accepted in the medical community, the testimony regarding the circumstances in this case is not sufficient to allow the Court to infer that Raber agreed to be responsible for those consequential damages if he breached the contract. WRMC has not met its burden of proof for consequential damages based on the *locum tenens* expense resulting from Raber's breach of the employment contract.

### III. Conclusion

The Court will award general damages in the amount of $3,672 for payroll taxes, and $9,177.02 for recruitment expenses, which the Court finds to be a reasonable amount. The Court previously made a finding (Doc. 21) that the sum of $48,000 plus interest was due and that judgment would be entered with the final judgment. WRMC is entitled to recover attorney's fees and costs on the breach of contract action pursuant to Ark. Code Ann. §16-22-308. WRMC is directed to file a motion for attorney's fees and costs by November 9, 2018, or a stipulation to the amount if the parties agree. Any response is due within seven days of the filing of the motion. A final judgment will be entered pursuant to Rule 54 of the Federal Rules of Civil Procedure after consideration of a motion for attorneys' fees and costs.

IT IS SO ORDERED this 26th day of October 2018.

/s/P. K. Holmes, III
P.K. HOLMES, III
CHIEF U.S. DISTRICT JUDGE